FILED

2007 AUG -6 P 1: 53

DISTRICT COURT
TFORD, CT

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECITCUT

| | | |
|---|---|---|
| GLOBAL WIRE, INC., WYRE WYND LIFE WIRE, INC., and MONTGOMERY WIRE CORP., on Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) | No. CLASS ACTION  3:07CV1192 (JCH) |
| Plaintiffs, | ) ) ) | COMPLAINT FOR VIOLATION OF §1 OF THE SHERMAN ACT |
| vs. | ) ) ) | |
| ARKANSAS BEST CORPORATION, ABF FREIGHT SYSTEMS, INC., AVERITT EXPRESS, CON-WAY INC., CON-WAY FREIGHT INC., FEDEX CORPORATION, FEDEX FREIGHT CORPORATION, JEVIC TRANSPORTATION, INC., NEW ENGLAND MOTOR FREIGHT, INC., OLD DOMINION FREIGHT LINE, INC., R+L CARRIERS, INC., SAIA, INC., SAIA MOTOR FREIGHT LINE LLC, UNITED PARCEL SERVICE, INC. and YRC WORLDWIDE INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | | |

Plaintiffs Global Wire, Inc., Wyre Wind Life Wire, Inc., and Montgomery Wire Corp. (collectively, "Plaintiffs") individually and on behalf of those similarly situated, bring this action for damages and injunctive relief under the antitrust laws of the United States against defendants Arkansas Best Corporation, ABF Freight Systems, Inc., Averitt Express, Con-Way Inc., Con-Way Freight Inc., FedEx Corporation, FedEx Freight Corporation, Jevic Transportation, Inc., New England Motor Freight, Inc., R+L Carriers, Inc., SAIA, Inc., Saia Motor Freight Line LLC United Parcel Services, Inc., and YRC Worldwide, Inc. (collectively, "Defendants"). Based upon personal knowledge, information and belief, and the investigation of counsel, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      This case arises out of conspiracy among the Defendants and their coconspirators to fix the prices of "fuel surcharges" applied to less-than-truckload freight shipments ("LTL"). This case is brought as a class action on behalf of all persons who, from at least as early as June 15, 2003 to the present (hereinafter, the "Class Period"), purchased LTL and paid a "fuel surcharge" directly to one or more of the Defendants. Because of Defendants' unlawful conduct, Plaintiffs and the members of the Class (defined below) have paid unlawful, artificially high prices for LTL and, therefore, have suffered injury to their respective businesses.

2.      At all times relevant to this Complaint, Plaintiffs have been direct purchasers of LTL from one or more of the Defendants. Plaintiffs bring this class action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover damages, the costs of suit, including reasonable attorneys' fees, to enjoin the continuation of the conspiracy, and for such other relief as is afforded under the antitrust laws of the United States for defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337 and 15 U.S.C. §§15, 26.

- 1 -

4.     Venue is proper in this district pursuant to 15 U.S.C. §§15, 22 and 26 and pursuant to 28 U.S.C. §1391(b), (c) and (d), because at all times relevant to the Complaint , (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of Plaintiffs' claim occurred in this district; (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

5.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this district and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of LTL sold to purchasers in this district; (b) transacted business in LTL and other products in this district; (c) maintain and have maintained continuous and systemic contacts with this district over a period of years; (d) purposefully avails itself of the benefits of doing business in this district.     Accordingly, each of the Defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

## PARTIES

6.     Plaintiff Global Wire, Inc. ("Global Wire"), is a resident of Connecticut.  Global Wire purchased LTL, including paying collusively set and imposed "fuel surcharges," directly from one or more of the Defendants during the Class Period.  Because of Defendants' and/or their co-conspirators' unlawful conduct, the prices that Global Wire paid Defendants and/or their co-conspirators for LTL were unlawfully and artificially high, causing Global Wire injury to its business.  Therefore, Global Wire asserts a claim against Defendants on behalf of itself and all other direct purchasers of LTL who paid a "fuel surcharge" when purchasing LTL from the Defendants and/or their coconspirators during the Class Period.

7.     Plaintiff Wyre Wynd Life Wire, Inc. ("Wyre Wind"), is a resident of Connecticut. Wyre Wynd Life Wire purchased LTL, including paying collusively set and imposed "fuel surcharges," directly from one or more of the Defendants during the Class Period.  Because of

Defendants' and/or their coconspirators' unlawful conduct, the prices that Wyre Wind paid Defendants and/or their co-conspirators for LTL were unlawfully and artificially high, causing Wyre Wind injury to its business. Therefore, Wyre Wind asserts a claim against Defendants on behalf of itself and all other direct purchasers of LTL who paid a "fuel surcharge" when purchasing LTL from the Defendants and/or their coconspirators during the Class Period.

8.      Plaintiff Montgomery Wire Corp. ("Montgomery") is a resident of New Hampshire. Montgomery purchased LTL, including paying collusively set and imposed "fuel surcharges," directly from one or more of the Defendants during the Class Period. Because of Defendants' and/or their coconspirators' unlawful conduct, the prices that Montgomery paid Defendants or their co-conspirators for LTL were unlawfully and artifically high, causing Montogomery injury to its business. Montgomery asserts a claim against Defendants on behalf of itself and all other direct purchasers of LTL who paid a "fuel surcharge" when purchasing LTL from the Defendants and/or their coconspirators during the Class Period.

9.      Defendant Arkansas Best Corporation  is a publicly-traded trucking conglomerate offering LTL services under a variety of business names and wholly-owned alter-ego subsidiaries, including without limitation ABF, ABF Freight System, ABF Freight System Canada, ABF Cartage, Land-Marine Cargo, and FreightValue, Inc.  ABF's headquarters are located at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903. During the Class Period, Arkansas Best Corporation directly and/or through its control of its affiliates, including without limitation its wholly-owned subsidiary Defendant ABF Freight Systems, Inc. sold LTL throughout the United States.

10.      Defendant ABF Freight Systems, Inc. is a wholly-owned subsidiary of Defendant Arkansas Best Corporation and according to its website "is one of North America's largest LTL carriers of general commodities." ABF Freight Systems, Inc. services all 50 States and in 2006, its revenues exceeded $1.8 billion. ABF Freight Systems, Inc's headquarters are also located at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903. During the Class Period, Arkansas

Freight Systems, Inc. directly and/or through or under the control of its affiliates, including without limitation Defendant Arkansas Best Corporation, sold LTL throughout the United States.

11.    Collectively, Arkansas Best Corporation and ABF Freight Systems, Inc. are referred to as "ABF" or the "ABF Defendants." Each of the ABF Defendants joined the conspiracy alleged herein and is legally responsible for its conduct because its directors, officers, employees, and/or agents acting within the scope of their authority, reached an unlawful agreement with their competitors to fix prices and restrain competition. Alternatively, each of the ABF Defendants is legally responsible because it acted through, facilitated, dominated, and/or controlled that actions of the other ABF Defendants in furtherance of the conspiracy alleged herein.

12.    Defendant Averitt Express ("AE") is a privately-held company that provides LTL service in the southern U.S. and through partnerships elsewhere in North America. AE operates a fleet of approximately 4,000 tractors and 11,250 trailors from a network of about 80 terminals. AE's 2007 revenues are estimated to be over $800 million. AE's headquarters are at Perimeter Place One, 1415 Neal Street, Cookeville, Tennessee 38502. During the Class Period, Averitt directly and/or through its control of its affiliates sold LTL throughout the United States.

13.    Defendant Con-way Inc. ("Con-Way") (formerly known as CNF, Inc.) is a publicly-traded company providing LTL through its wholly-owned subsidiary Con-way Freight throughout the United States. Con-way's headquarters are at 2855 Campus Drive, Suite 300, San Mateo, California 94403. During the Class Period, Con-way directly and/or through its control of its affiliates, including without limitation Defendant Con-way Freight, Inc., sold LTL throughout the United States.

14.    Defendants Con-way Freight Inc. is a wholly-owned subsidiary of Defendant Con-way and provides LTL through its regional LTL motor carriers: Con-way Freight Western, Con-way Freight Central, and Con-way Freight Southern. In 2006, Con-way Freight's revenues were about $2.8 billion. Con-way Freight Inc.'s headquarters are located at 110 Parkland Plaza

Ann Arbor, Michigan 48103. During the Class Period, Con-way Freight Inc. directly and/or through or under the control of its affiliates sold LTL throughout the United States.

15.   Collectively, Defendant Con-way Inc. and Defendant Con-way Freight, Inc. are referred to as "CW" or the "Con-way Defendants." Each of the Con-way Defendants joined the conspiracy alleged herein and is legally responsible for its conduct because its directors, officers, employees, and/or agents acting within the scope of their authority, reached an unlawful agreement with their competitors to fix prices and restrain competition. Alternatively, each of the Con-way Defendants is legally responsible because it acted through, facilitated, dominated, and/or controlled that actions of the other Con-way Defendants in furtherance of the conspiracy alleged herein.

16.   Defendant FedEx Corporation ("FedEx") is an internationally recognized company providing transportation, e-commerce, and business solutions. According to FedEx's website, its wholly-owned subsidiary FedEx Freight Corporation is a leading U.S. provider of regional next-day and second-day LTL service and had annual revenues of $4.5 billion in fiscal year 2007. FedEx's headquarters are located at 942 South Shady Grove Road, Memphis, Tennessee 38120. During the Class Period, FedEx directly and/or through its control of its affiliates, including without limitation its wholly-owned subsidiary FedEx Freight Corporation, sold LTL services throughout the United States.

17.   Defendants FedEx Freight Corporation is a wholly-owned subsidiary of Defendant FedEx and provides (as alleged in the preceding paragraph) LTL service throughout the United States. During the Class Period, FedEx Freight Corporation directly and/or through or under the control of its affiliates sold LTL services throughout the United States.

18.   Collectively, Defendant FedEx and Defendant FedEx Freight Corporation are referred to as "FedEx" or the "FedEx Defendants." Each of the FedEx Defendants joined the conspiracy alleged herein and is legally responsible for its conduct because its directors, officers, employees, and/or agents acting within the scope of their authority, reached an unlawful agreement with their competitors to fix prices and restrain competition. Alternatively, each of

the FedEx Defendants is legally responsible because it acted through, facilitated, dominated, and/or controlled that actions of the other FedEx Defendants in furtherance of the conspiracy alleged herein.

19.     Defendant Jevic Transportation, Inc. ("Jevic") is a LTL carrier operating in the northeastern United States and also providing LTL services. Jevic's fleet consists of about 1,400 tractors and 2,400 trailers. It's 2005 revenues were about $350 million. Prior to June 30, 2006, Jevic was owned by Defendant SAIA, Inc. Jevic's headquarters are at 600-700 Creek Road, Delanco, New Jersey 08075. During the Class Period, Jevic directly and/or through its control of its affiliates sold LTL services throughout the United States.

20.     Defendant New England Motor Freight, Inc. ("NEMF") is a privately-held company providing LTL service in the northeastern and mid-atlantic United States, Eastern Canada, and Puerto Rico. Through alliances with other carriers, NEMF is able to provide LTL services to most of the United States. NEMF's headquarters are at 1-71 North Avenue East, Elizabeth, New Jersey 07201. During the Class Period, NEMF directly and/or through its control of its affiliates sold LTL services throughout the United States.

21.     Defendant Old Dominion Freight Line Inc. ("ODFL") is publicly-traded company and is (as described by its website) "a leading national less-than-truckload (LTL) carrier providing direct service to 47 states." ODFL operates over 4,600 tractors and 13,100 trailers and in 2006, generated revenue in excess of $1.2 billion. ODFL's headquarters are at 500 Old Dominion Way, Thomasville, North Carolina 27360. During the Class Period, ODFL directly and/or through its control of its affiliates sold LTL services throughout the United States.

22.     Defendant R+L Carriers, Inc. ("RLC") is a privately-held LTL company, serving all 50 States, Canada, and Puerto Rico, operating a fleet of more than 13,000 tractors and trailers. RLC operates under its own name and under the names R+L Transfer, Gator Freightways, Greenwood Motor Lines, and Paramount Transportation. RLC's headquarters are at 600 Gillam Road, Wilmington, Ohio 45177. During the Class Period, RLC directly and/or through its control of its affiliates sold LTL services in this district and throughout the United States.

23.    Defendant SAIA, Inc. ("SAIA") (formerly known as SCS Transportation, Inc.) is a publicly-traded company providing LTL services to about 34 states through its wholly-owned operating subsidiary Saia Motor Frieght Line LLC.  According to its website, SAIA is a top ten LTL company having achieved most of its growth through mergers and acquisitions.  Previously, SAIA had been a wholly-owned subsidiary of Yellow Corporation (now known as Defendant YRC Worldwide) and became an independent public company on September 30, 2002.  On June 30, 2006, SAIA completed the sale of Defendant Jevic to a private investment firm.  SAIA's headquarters are at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097.  During the Class Period, SAIA directly and/or through its control of its affiliates, including without limitation its wholly-owned subsidiary Saia Motor Freight Line LLC, sold LTL services throughout a majority of the United States.

24.    Defendant Saia Motor Freight Line LLC is a wholly-owned subsidiary of Defendant SAIA.  In 2006, Defendant Saia Motor Freight Line LLC reported annual revenues of $874.7 million of which $102.5 million was attributable to the "fuel surcharge."  During the Class Period, Defendant SAIA Motor Freight Line LLC directly and/or through or under the control of its affiliates, including without limitation Defendant Saia, sold LTL services throughout a majority of the United States.

25.    Collectively, Defendant SAIA and Defendant Saia Motor Frieght Line LLC are referred to as the "Saia Defendants."  Each of the Saia Defendants joined the conspiracy alleged herein and is legally responsible for its conduct because its directors, officers, employees, and/or agents acting within the scope of their authority, reached an unlawful agreement with their competitors to fix prices and restrain competition.  Alternatively, each of the Saia Defendants is legally responsible because it acted through, facilitated, dominated, and/or controlled that actions of the other Saia Defendants in furtherance of the conspiracy alleged herein.

26.    Defendant United Parcel Service, Inc. ("UPS") is an internationally-recognized freight, package delivery, and supply chain management company.  On August 5, 2005, UPS acquired Overnite Corp. and entered the LTL market.  Upon information and belief, UPS

assumed Overnite Corp.'s liabilities.  In 2006, UPS rebranded Overnite Corp. as UPS Freight, and UPS Freight's annual revenues for 2006 were in excess of $1.8 billion.  According to the American Trucking Association, UPS Freight is now the fourth largest LTL provider.  UPS's headquarters are located at 55 Glenlake Parkway, NE, Atlanta, Georgia 30328.  During the Class Period, UPS directly and/or through its control of its affiliates, including without limitation its UPS Freight business, sold LTL services throughout the United States.

27.     Defendant YRC Worldwide Inc. ("YRC") is one of the largest transportation service providers in the world.  It operates in the LTL market through its wholly-owned operating subsidiaries Yellow Transportation, Inc., Roadway Express, Inc. and YRC Regional Transportation, Inc.  YRC's headquarters are located at 10990 Roe Avenue, Overland Park, Kansas 66211.  During the Class Period, YRC directly and/or through its control of its affiliates sold LTL services in throughout the United States.

### CO-CONSPIRATORS AND AGENTS

28.     Other natural persons, corporations, and entities not named as defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

29.     Whenever in this Complaint reference is made to an act, statement, or transaction of any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

### INTERSTATE TRADE AND COMMERCE

30.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that inter alia:

(a)     Defendants and their coconspirators have sold and provided LTL services throughout the United States;

- 8 -

(b)    Defendants and their coconspirators have each used instrumentalities of interstate commerce to sell and provide LTL services throughout the United States;

(c)    In furtherance of the conspiracy alleged herein, Defendants have traveled between states and have exchanged communications through interstate wire communications; and

(d)    The conspiracy alleged herein has affected and restrained billions of dollars of commerce. Defendants and their coconspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiffs and other entities who are themselves engaged in interstate commerce.

## FACTS

31.    Plaintiffs and the members of the Class purchase LTL as a means to transport freight within North America by ground. Based on articles in trucking industry trade journals, Plaintiff estimates annual domestic LTL industry revenue ranged from $25 to $35 billion during the Class Period.

32.    A number of structural characteristics of the LTL industry facilitate the implementation and maintenance of the horizontal price-fixing conspiracy alleged herein:

(a)    LTL is a commodity product. One Defendants' LTL is substitutable for another's. Defendants sell and Plaintiffs (and members of the Class) purchase LTL primarily on the basis of price.

(b)    Demand for LTL is inelastic. Accordingly, the gains from collusion are substantial.

(c)    The LTL industry in the United States is highly concentrated, facilitating coordination of prices. During the Class Period, Defendants' combined United States market share exceeded 75%.

(d)    There are substantial barriers to entry in the LTL industry requiring substantial time, resources, and industry knowledge to even potentially overcome. Viable entry requires the purchase or lease of hundreds of trucks and dozens of truck depots.

Similarly, viable entry requires that a new provider capture a significant market share from existing providers. Thus, entry is both expensive and risky. Entry is further restricted by the tight labor market for truck drivers.

(e)     Even for potential shipping experts who possess the capital and know how to possibly enter the market, viable entry takes a long time. When package shipping leaders FedEx and UPS decided to enter the LTL market, they purchased and rebranded existing LTL companies rather than attempting to enter the market directly.

(f)     LTL is a nondurable product. Unlike some industries, shippers cannot "stock up" on LTL when prices are low and use this stockpile when shipping prices are high.

(g)     The Defendants all sell at the retail level of distribution as horizontal competitors.

(h)     Price is the most important competitive factor in LTL shipping, and the standardized nature of LTL shipping services hinders substantial and material non-price competition.

(i)     Newer industries are typically characterized by rapid growth, innovation, and high profits. The LTL industry is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

(j)     The industry has a history of "cooperation." For example, several regional LTL companies have formed alliances with other regional LTL companies, under the claimed purpose of allowing nationwide service, but in fact with many more companies than would be required to offer such services. The level of cooperation within the trucking industry is conducive to the type of unlawful collusion alleged herin.

(k)     The LTL industry has become increasingly concentrated. For example, in 2003, Defendant YRC, then operating under the name of Yellow, merged with Roadway, then one of its largest LTL companies. The combined Yellow/Roadway entity then merged in 2005 with USF, further increasing LTL market concentration.

(1)     Defendants' publication of prices facilitated monitoring against cheating on the unlawful agreement to impose supra-competitive "fuel surcharges".

33.     Fuel cost is the single substantial variable Defendants must cover that is subject to wide variation in price.   When a company's variable costs increase, without a concomitant offsetting increase in demand, the profits of the company will decrease because the company can only pass on a portion of the cost increase to its customers.

34.     Defendants, facing increased fuel costs and the likelihood of lower profits, have evaded this basic economic law by collusively imposing on their customers what are claimed to be "fuel surcharges," but which in fact bear little relation to the increase in their fuel costs. Higher fuel costs in fact were merely the pretext and an opportunity for Defendants to agree among themselves to impose collusive "fuel surcharges."

35.     Observers of the LTL industry, and indeed some of the Defendants themselves, have noted the direct relationship between high fuel prices and LTL profits.

36.     A 2006 article in *Traffic World*, a weekly trade publication covering the transportation and logistics industry, quoted Ken Hazen, president of transportation software and freight payment firm CTSI, as describing fuel surcharges as "'a profit center now . . . . Carriers are in control.   They're in the catbird seat.'"

37.     A transportation industry analyst at Bear Sterns noted that "'Our sense is that generally the LTL carriers make money on fuel surcharges and that earnings for LTL providers would be hurt by sustained lower fuel costs.'"

38.     A 2005 article in *Fleet Owner*, a trade magazine for executives and managers of commercial trucking fleets, noted that in the past increased fuel prices were harmful to the LTL industry, but had become profitable during the recent period of increased prices:

> High diesel fuel prices usually signal harsh times for trucking. . . .
> That doesn't seem to be the case this year.

39.     Defendant ODFL frankly admitted in its 2006 annual report that higher fuel prices increase its profitability, and lower fuel prices decrease its profitability:

A rapid and significant decrease in diesel fuel prices would likely reduce our revenue and operating income until we revised our pricing strategy to reflect these changes.[1]

40.     Defendant YRC also made this admission:

In general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us in the short term.

41.     As did the ABF Defendants:

As diesel fuel prices decline, the fuel surcharge and associated direct diesel fuel costs also decline by different degrees. Depending upon the rates of these declines and the impact on costs in other fuel and energy-related areas, operating margins could be negatively impacted.

42.     As did SAIA Defendants:

While fuel costs increased during 2006, higher fuel surcharges have more than offset higher diesel costs.

43.     In sum, Defendants imposition of the "fuel surcharges" are not explained as independent rational decisions to pass on the same rising costs of fuel.    Rather, the fuel surcharges imposed by all Defendants represent collusive conduct.

## OPERATION OF THE PRICE-FIXING CARTEL

44.     When fuel prices began increasing in the early 2000s, LTL companies began imposing increasingly high "fuel surcharges."  These "fuel surcharges" were not set by the rate-setting organizations, and thus are beyond the scope of any antitrust immunity.

45.     Defendants agreed to impose identical or nearly identical "fuel surcharges" by agreeing to tie the "fuel surcharges" to an index of diesel fuel prices published to the public by the United States Department of Energy ("Fuel Index").   Further, in order to communicate movement pricing and to police the cartel, each of the Defendants lists its fuel surcharges in their Web sites.  As a result, Defendants' "fuel surcharges" move in lockstep, as illustrated in the following chart showing the fuel surcharges of each Defendant at different Fuel Index levels:

---

[1]     All further citations to statements by Defendants and by companies in other industries being compared to Defendants, unless otherwise noted, come from their respective 2006 annual reports.

| Diesel Fuel $/Gallon | ABF | AE | CW | FedEx Freight | Jevic | ODFL | RLC | Saia | UPS | YRC |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.80 | 8.9% | 8.9% | 9.0% | 8.9% | 8.9% | 8.5% | 8.9% | 8.9% | 8.9% | 8.9% |
| 2.00 | 10.9% | 10.8% | 10.9% | 10.9% | 10.9% | 10.5% | 10.9% | 10.9% | 10.9% | 10.9% |
| 2.20 | 12.9% | 12.9% | 12.9% | 12.9% | 13.0% | 12.5% | 12.9% | 12.9% | 12.9% | 12.9% |
| 2.40 | 14.9% | 14.9% | 14.9% | 14.9% | 15.0% | 14.5% | 14.9% | 14.9% | 14.9% | 14.9% |
| 2.60 | 16.9% | 16.9% | 16.9% | 16.9% | 17.0% | 16.5% | 16.9% | 16.9% | 16.9% | 16.9% |
| 2.80 | 18.9% | 18.9% | 18.9% | 18.9% | 19.0% | 18.5% | 18.9% | 18.9% | 18.9% | 18.9% |
| 3.00 | 20.9% | 20.9% | 20.9% | 20.9% | 21.0% | 20.5% | 20.9% | 20.9% | 20.9% | 20.9% |
| 3.20 | 22.9% | 22.9% | 22.9% | 21.9% | 23.0% | 22.5% | 21.9% | 22.9% | 22.9% | 22.9% |
| 3.40 | 24.9% | 24.9% | 24.9% | 22.9% | 25.0% | 24.5% | 22.9% | 24.9% | 24.9% | 24.9% |
| 3.60 | 26.9% | 26.9% | 26.9% | 23.9% | 27.0% | 26.5% | 23.9% | 26.9% | 26.9% | 26.9% |

46.     Recently the Fuel Index was near $3.00.  At that price, Defendants charged a "fuel surcharge" of 20.5%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, and 21.0%.

47.     The amount of the "fuel surcharge" imposed by the Defendants on shipping orders exceeds the entire cost of fuel for delivering the freight of most customers, and vastly exceeds the increase in fuel prices since the "fuel surcharge" was imposed.

48.     For example, Plaintiff Wyre Wynd shipped 7 pallets from Jewett City, Connecticut to Saint Augustine, Florida weighing a total 2346 lbs and taking 17 square feet of floor space.  This is equal to 4% of the floor space of a standard two "pup" long-haul trailer and 5% of its weight capacity.  Shipping distance and weight were used to calculate the price of the shipment.  The distance between the two cities is approximately 1125 miles.  The mileage of the type of truck used for such shipments is approximately 7.5 miles per gallon.  Plaintiff Wyre Wind was charged a "fuel surcharge" for this shipment of $103.04.  Using the formula of $103.04 / 5%, the total surcharge for the entire truck at that rate would have been $2060.  The total cost of the fuel, however, would have been $412 (1125 miles / 7.5 mpg * diesel fuel price of $2.75).  The total increased cost of fuel for the shipment over the low prices that prevailed earlier in the decade, the ostensible reason for the $2000+ surcharge, would have been approximately $196.  Using the more generous assumptions that the shipment was only half full, and the route

taken was a circuitous 1500 miles rather than a direct 1125 miles, still yields a total fuel bill of $550 (in fact it would be even lower because of empty space in the truck) and a "fuel surcharge" of $1030. Thus, even in a conservative scenario, the fuel surcharge applied to Plaintiff Wyre Wynd's shipment, supposedly to cover only the increased cost of fuel, was approximately *twice the entire cost of fuel for the shipment.*

49.     One need not resort to these calculations to see "fuel surcharges" vastly exceed a Defendants' increased costs of fuel. For example, FedEx noted that for FedEx Freight, its LTL service, "While fuel costs increased substantially in 2006, fuel surcharges more than offset the effect of higher fuel costs . . . ." Similarly, CW states: "As fuel prices have risen, the fuel surcharge has increased Con-way Freight's yields and revenue, and Con-way Freight has more than recovered higher fuel costs and fuel-related increases in purchased transportation."

50.     The allegations of collusion are further supported by the contact between Defendants yielding significant opportunities to conspire. For example, representatives of defendants AE, CW, FedEx, RLC, UPS, and YRC attended SMC3 conferences in 2006 and 2007 a written agenda "Industry consolidation, capacity issues and changing trade patterns . . . that have led to greater collaboration between all constituents in North America's logistics network."

51.     Representatives of Defendants also have met through such organizations as the American Trucking Association and the Motor Freight Carriers Association.

52.     A fall 2005 meeting, featuring David Gorman, CEO of defendant Jevic, concerned in part the topic of Capitol Hill's response to "fuel surcharges." The meeting offered "educational sessions and networking opportunities."

**EFFECTS**

53.     The unlawful contract, combination or conspiracy alleged above had, *inter alia,* the following effects:

(a)     Prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for LTL services were maintained at artificially high and noncompetitive levels; and

- 14 -

(b)     Plaintiffs and members of the Classes were required to pay more for LTL services than they would have paid in a competitive marketplace unfettered by defendants' and their co-conspirators' collusive and unlawful price-fixing.

54.     During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiffs and members of the Damages Class directly purchased LTL services in the United States.

55.     Plaintiff and the other Damages Class members paid more for the LTL than they would have paid under conditions of free and open competition.

56.     As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, plaintiff and the members of the Damages Class were injured and financially damaged in their businesses and property, in amounts that are not presently determinable.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

58.     Plaintiff brings this action on behalf of itself and the members of the Class comprising:

> All persons or entities who purchased LTL and paid a "fuel surcharge" directly to Defendants or their unnamed co-conspirators from June 15, 2003 to the present.  Excluded from the Class are federal government entities, the defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

59.     Plaintiffs bring this action on their own behalf and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Classes.

60.     Plaintiffs believe the Class numbers in the thousands, the exact number and identities being known only by Defendants.

61.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

62.     There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof.  The questions include but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize fuel surcharges imposed for LTL sold in the United States;

(b)     The identity of participants in the conspiracy;

(c)     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated §1 of the Sherman Act;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Class;

(f)     The effect of Defendants' conspiracy on the prices of LTL sold in the United States during the Class Period; and

(g)     The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

63.     Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of other members of the Class, and Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs paid "fuel surcharges" for LTL directly to one or ore of the Defendants.  Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.  In addition, Plaintiffs are represented by competent counsel experienced in the prosecution of class action antitrust litigation.

64.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

65.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

66.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable from records in the files of Defendants and their co-conspirators.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by members of the Classes who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

**CLAIM FOR RELIEF**
**For Violation of 15 U.S.C.  §1**

67.    Plaintiffs reallege and incorporate each and every allegation set forth above as if fully written herein.

68.    From a date unknown, but beginning at least as early as June 15, 2003, and continuing through the present, Defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violations of 15 U.S.C. §1.

69.    In furtherance of the unlawful conspiracy, upon information and belief, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia*:

(a)    agreeing to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of fuel surcharges of LTL services sold in the United States;

(b)    communicating with co-conspirators regarding prices to be charged for LTL "fuel surcharge" services;

- 17 -

(c)     meeting with co-conspirators in order to keep the existence of the conspiracy unknown so as to foster the illegal anti-competitive conduct described herein; and

(d)     refraining from competition by refusing to offer fuel surcharges and LTL services at prices below the agreed-upon fixed price.

70.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of fuel surcharges on LTL services.

71.     Defendants' anti-competitive agreement was implemented by, *inter alia*, instituting surcharges calculated by reference to publicly published indices. These coordinated price increases continued on a regular basis through the present, with the actual and intended result that Plaintiffs and members of the Class paid supracompetitive prices for fuel surcharges on LTL services. Defendants falsely attributed these price increases to the cost of fuel. As a direct and proximate result of the fuel surcharges on LTL price-fixing conspiracy, defendants have restrained competition in the LTL market and injured Plaintiffs and each Class member in their business and property in that they have each paid a higher price for fuel surcharges on LTL services than they would have paid absent the concerted unlawful activity.

72.     The conduct of Defendants and their co-conspirators constitutes a *per se* violation of §1 of the Sherman Act, 15 U.S.C. §1.

### PETITION FOR RELIEF

WHEREFORE, Plaintiffs petition that:

A.     The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.     The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of §1 of the Sherman Act, 15 U.S.C. §1.

C.     Judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees.

D.     Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

(a)     Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(b)     Communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of any product except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E.     Plaintiffs and members of the Classes have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury of the claim asserted in this Complaint.

DATED: August 6, 2007

SCOTT + SCOTT LLP

DAVID R. SCOTT   CT16080

P.O. Box 192
108 Norwich Ave.
Colchester, CT  06415
Telephone: 860/537-5537
Facsimile: 860/537-4432

ARTHUR L. SHINGLER III
HAL D. CUNNINGHAM
600 B Street, Suite 1500
San Diego, CA 92101
Telephone: 619/233-4565
Facsimile: 619/233-0508

LAW OFFICE OF DEAN DEPIERO
DEAN E. DEPIERO
5580 Ridge Road
Parma, OH 44129
Telephone: 440/884-8001
Facsimile: 440/884-8012


Attorneys for Plaintiffs